UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:11CV-31-R

[CAPITAL CASE]

WILLIAM EUGENE THOMPSON                                    PETITIONER

v.

PHILLIP W. PARKER                                         RESPONDENT

## I.  INTRODUCTION

This matter is before the Court on the amended petition for a writ of habeas corpus under

28 U.S.C. § 2254 filed by William Eugene Thompson, by counsel.  While serving a life sentence

for murder in the minimum-security Western Kentucky Farm Center, Thompson killed Charles

Fred Cash, a Kentucky Department of Corrections officer.  Thompson pleaded guilty to the

murder.  At a sentencing trial, the jury sentenced Thompson to death.

The Court has exhaustively reviewed the parties' briefing, the record below, and the

relevant case law.  After doing so, the Court concludes that Thompson is not entitled to habeas

relief on any of the claims of error raised.  The Court also finds that a certificate of appealability

should issue with respect to claim five but should be denied as to Thompson's other claims.

## II.  FACTUAL FINDINGS

The Kentucky Supreme Court set out the following facts underlying Thompson's

sentence.  *Thompson v. Commonwealth*, 147 S.W.3d 22 (Ky. 2004).

> At the time of this crime, Appellant was serving a life sentence for murder.  He was
> transferred to the Western Kentucky Farm Center, a minimum security prison facility
> that includes an inmate-operated dairy farm.  During the early morning hours of May
> 9, 1986, Appellant and his supervisor, Fred Cash, reported to work at the dairy barn.
> According to Appellant, he became enraged outside a calf barn while he and Mr.
> Cash were attempting to start some equipment.  Appellant admits striking Mr. Cash

once to the head with a hammer.  Little is known about exactly what transpired thereafter, as Appellant claims to have "blacked out."  However, the evidence reveals that Mr. Cash's skull was crushed by numerous blows to the head with a hammer and his body was dragged into a calf's stall.  According to Appellant, upon realizing what he had done, he removed Mr. Cash's pocketknife, keys and wallet, and left the Farm Center in the prison dairy truck.  Appellant fled to the nearby town of Princeton, where he purchased a ticket and boarded a bus bound for Madisonville.  The authorities apprehended Appellant in Madisonville.

*Id.* at 31.[1]  This Court presumes the state court's findings of fact to be correct.  *See* 28 U.S.C. § 2254(e)(1).

### III.  PROCEDURAL HISTORY

Thompson originally was tried before a jury in Lyon Circuit Court in October of 1986 and was found guilty of murder, first-degree robbery, and first-degree escape.  He was sentenced to death, twenty years, and ten years, respectively.  The Kentucky Supreme Court reversed the conviction and remanded the case for a new trial.  *Thompson v. Commonwealth*, 862 S.W.2d 871 (Ky. 1993).  Upon remand, Thompson pleaded guilty to all three charges.  Thompson waived jury sentencing on the robbery and escape charges and was sentenced to two consecutive prison terms totaling twenty years.  A second penalty-phase trial was held in Graves Circuit Court on February 2 - 11, 1998, to determine sentencing on the murder charge.  The prosecution called ten witnesses, and the defense called four witnesses, including Thompson himself.  At the conclusion, Thompson was again sentenced to death for the murder of Fred Cash.  The jury found the existence of the following two aggravating factors:  Thompson's prior conviction of murder and the victim was a corrections officer engaged in the performance of his duties at the

---

[1]Additional facts will be developed where relevant to Thompson's claims of error.

2

time of his murder.  *Thompson v. Commonwealth*, 147 S.W.3d at 45.  The trial court formally sentenced Thompson to death on March 12, 1998.

Thompson again appealed his sentence, raising a number of issues including his competency to enter a guilty plea.  The Kentucky Supreme Court remanded the case for a retrospective competency hearing and abated determination of the remaining issues on appeal.  *Thompson v. Commonwealth*, 56 S.W.3d 406, 407 (Ky. 2001).  After a hearing, the trial court determined that Thompson had been competent to plead guilty.  Thompson filed a subsequent appeal raising twenty-nine claims of error.  The Kentucky Supreme Court affirmed Thompson's conviction and sentence in a unanimous opinion rendered on August 26, 2004.  *Thompson v. Commonwealth*, 147 S.W.2d at 84.  The United States Supreme Court denied *certiorari* on June 27, 2005.  *Thompson v. Kentucky*, 545 U.S. 1142 (2005).

Thompson filed a motion to vacate and set aside his sentence under Kentucky Rule of Criminal Procedure (RCr) 11.42 on May 18, 2006.  The Lyon Circuit Court denied the motion on May 15, 2009, finding an evidentiary hearing was not warranted.  Thompson appealed the denial to the Kentucky Supreme Court, which affirmed on October 21, 2010.  *Thompson v. Commonwealth*, No. 2009-SC-557-MR, 2010 Ky. Unpub. LEXIS 99, at *11 (Ky. Oct. 21, 2010).

Thompson filed a petition for writ of habeas corpus in the United States District Court for the Western of District of Kentucky on March 1, 2011.  He filed an amended petition on July 12, 2011.  In his amended petition, he raises the following seven claims for relief:  1) the jury considered extrajudicial evidence; 2) defense counsel was ineffective in not making sure that the jury knew Thompson was already serving out a life sentence; 3) the prosecutor engaged in improper argument; 4) the trial court unfairly limited questioning in *voir dire*; 5) the jury

3

instructions were improper on mitigation; 6) Kentucky's proportionality review process is flawed; and 7) cumulative error.

## IV. STANDARD OF REVIEW

**A.      AEDPA Standard of Review**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, which amended 28 U.S.C. 2254, governs this Court's review of the instant habeas petition.  The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'"  *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 420, 436 (2000)).  The AEDPA sets forth "an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings."  *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citing §§ 2254(d)(1)-(2); *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).  Under the AEDPA,

(d) An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254.

The standard under the AEDPA, on which the petitioner bears the burden of proof, is "'difficult to meet' [and a] 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011) (quoting *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 786 (2011); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).  The Supreme Court recently explained that the AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 131 S. Ct. at 786 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)); *see also Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) ("Section 2254(d), as amended by AEDPA, is a purposefully demanding standard.") (citing *Harrington v. Richter*, 131 S. Ct. at 786).  The Supreme Court cautioned that the AEDPA requires federal habeas courts to review state court decisions with "deference and latitude," and that "[a] state court's determination that a claim lacks merit precludes habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are independent tests and must be analyzed separately. *Williams v. Taylor*, 529 U.S. at 412-13; *Hill v. Hofbauer*, 337 F.3d 706, 711 (6th Cir. 2003).  A state court decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *William v. Taylor*, 529 U.S. at 405.

5

A state court's ruling violates the "unreasonable application" clause "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. An unreasonable application can also occur where "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* Unreasonableness is an objective standard, and the fact that another court has applied the law in the same manner is not dispositive. *Id.* at 409-10. "Unreasonable" is distinct from "incorrect"; even if a state court incorrectly applies a rule of law, that error will not warrant habeas relief unless the application was objectively unreasonable. *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003).

The "clearly established federal law" clause of § 2254(d)(1) "refers to the holdings, as opposed to the dicta of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. at 412; *Barnes v. Elo*, 231 F.3d 1025, 1028 (6th Cir. 2000). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court[.] . . . It therefore cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, __ U.S. __, 132 S. Ct. 2148, 2155 (2012) (per curiam). Reviewing courts may consider lower federal court decisions, however, to the extent that such decisions reflect review and interpretation of "'relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court case law.'" *Smith v. Stegall*, 385 F.3d 993, 998 (6th Cir. 2004) (quoting *Hill v. Hofbauer*, 337 F.3d at 716).

Even where a state court decision does not specifically cite to relevant federal case law, the deferential AEDPA review standard applies. *Early v. Packer*, 537 U.S. 3, 8 (2002) (holding

that the state court is not required to cite United States Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them").  However, the deferential standard of the AEDPA does not apply where the state court has not adjudicated the merits of the particular claim.  *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004) (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) ("Where as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.") (citing *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001)).  In that instance, the claim is reviewed *de novo.  Id.*

The Supreme Court recently emphasized the limitation on review under § 2254(d)(1) in *Cullen v. Pinholster*, 131 S. Ct. at 1398.  In that case, the Supreme Court held that a federal court's review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.  *Id*.  This is because "review under § 2254(d)(1) focuses on what a state court knew and did.  State-court decisions are measured against this Court's precedents as of 'the time the state court renders its decision.'"  *Id*. at 1399 (citing *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)).  "To determine whether a particular decision is 'contrary to' then-established law, a federal court must consider whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court."  *Id*. (citing *Williams v. Taylor*, 529 U.S. at 405, 406).

With regard to the "unreasonable determination of the facts" clause in § 2254(d)(2), a "clear factual error" constitutes an "unreasonable determination of the facts in light of the evidence presented."  *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003).  In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing

evidence to the contrary.  This analysis mirrors the "presumption of correctness" afforded factual determinations made by a state court, which can only be overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003); *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001).  This presumption only applies to basic, primary facts, and not to mixed questions of law and fact.  *See Mitchell v. Mason*, 325 F.3d at 737-38.

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding.  28 U.S.C. § 2254(b)-(c).  A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the petitioner has been convicted has had a full and fair opportunity to rule on his or her claims.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  If the petitioner still has a remedy in the state courts in which the state court would have the opportunity to rule on the federal constitutional claims in petitioner's case, exhaustion has not occurred.  *Rust v. Zent*, 17 F.3d at 160.  At the current juncture, the Court sees no apparent exhaustion problems with the petition in this case and does not engage in a *sua sponte* analysis of exhaustion where Respondent has not raised it.

Habeas petitioners face an additional hurdle before federal courts may review a question of federal law decided by a state court.  As applied in the habeas context, the doctrine of procedural default prevents federal courts from reviewing claims that a state court has declined to address because of a petitioner's noncompliance with a state procedural requirement.  In *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), the Supreme Court held that, for purposes of comity, a federal court may not consider "contentions of federal law which are not resolved on

the merits in the state proceeding due to petitioner's failure to raise them as required by state

procedure."  Additionally, the Supreme Court held in *Coleman v. Thompson*, 501 U.S. 722

(1991), that:

> [If a] state prisoner has defaulted his federal claims in state court pursuant to an
> independent and adequate state procedural rule, federal habeas review of the claims
> is barred unless the prisoner can demonstrate cause for the default and actual
> prejudice as a result of the alleged violation of federal law, or demonstrate that
> failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 749.

**B.    Constitutionality of AEDPA**

Thompson argues that the AEDPA is unconstitutional.  In so doing, he relies solely on a

dissent from a denial of a rehearing *en banc* by Ninth Circuit Court of Appeals Judge Reinhardt

in *Crater v. Galaza*, 508 F.3d 1261 (9th Cir. 2007).  While making no substantive arguments

himself, Thompson quotes from Judge Reinhardt's dissent, which contends that the AEDPA's

deference provisions "constitute[] a severe congressional incursion on the federal 'judicial

power' which Article III of the Constitution vests wholly and exclusively in the federal courts."

*Id.* at 1261.  Judge Reinhardt asserts that the AEDPA violates the separation-of-powers doctrine

in two principal ways:  by prohibiting the federal courts from applying the ordinary principles of

*stare decisis*, thereby interfering with the federal courts' normal adjudicatory process, and by

requiring federal courts to give effect to incorrect state rulings which violate the Constitution.

Thompson also maintains that the issue has not yet been decided by the Supreme Court.

As stated in a recent case from the Eastern District of Michigan, *Harrison v. Forest*, No.

10-10723, 2012 U.S. Dist. LEXIS 95820, at *38-39 (E.D. Mich. July 11, 2012), the Fourth and

Ninth Circuits both have rejected the argument that the AEDPA violates the separation-of-

powers doctrine:

> In amending section 2254(d)(1), Congress has simply adopted a
> choice of law rule that prospectively governs classes of habeas cases;
> it has not subjected final judgments to revision, nor has it dictated the
> judiciary's interpretation of governing law and mandated a particular
> result in any pending case.  And amended section 2254(d) does not
> limit any inferior federal court's independent interpretive authority
> to determine the meaning of federal law in any Article III case or
> controversy.  Under the AEDPA, we are free, if we choose to decide
> whether a habeas petitioner's conviction and sentence violate any
> constitutional rights.   Section 2254(d) only places an additional
> restriction upon the scope of the habeas remedy in certain
> circumstances.   *Green v. French*, 143 F.3d 865, 874-75 (4th Cir.
> 1998) (internal citations [omitted]), *abrogated on other grounds by
> Williams v. Taylor*, 529 U.S. 362 (2000)).

> Section 2254(d) merely limits the source of clearly established law
> that the Article III court may consider, and that limitation served to
> govern prospectively classes of habeas cases rather than offend the
> court's authority to interpret the governing law and to determine the
> outcome in any pending case.  *Duhaime v. Ducharme*, 200 F.3d 597,
> 601 (9th Cir. 2000); *see also Evans v. Thompson*, 518 F.3d 1, 4-10
> (1st Cir. 2008).

*Harrison v. Forest*, 2012 U.S. Dist. LEXIS 95820, at *38-40.  While individual judges have

found the deference provisions of AEDPA to violate the separation-of-powers doctrine, "no

circuit court has taken that position on behalf of the entire circuit."  *Bonomelli v. Dinwiddie*, 399

F. App'x 384, 387 (10th Cir. 2010).

As to Thompson's argument that the constitutionality of the AEDPA has not yet been

decided by the Supreme Court, while it has not been squarely addressed by the Supreme Court,

"the constitutional foundations of § 2254(d)(1) are solidified by the Supreme Court's repeated

application of the statute."  *Bowling v. Parker*, No. 03-28-ART, 2012 U.S. Dist. 113022, at *30

(E.D. Ky. Apr. 2, 2012).  "It would be quite curious for the Supreme Court to apply a statute

more than five dozen times without any of the Justices so much as casting doubt on its validity." *Id.* at *31.

Accordingly, this Court concludes that § 2254(d) does not violate the doctrine of separation of powers.  With the foregoing principles in mind, the Court turns to Thompson's claims for habeas relief.

## V.  ANALYSIS

### A.    Claim One – Extrajudicial Evidence in Jury Room

Thompson first asserts that extrajudicial influence upon the jury's sentencing deliberations violated his constitutional rights to an impartial jury and to confront the witnesses against him under the Sixth and Fourteenth Amendments.

#### 1.    Background

Thompson contends that a juror was exposed to information concerning another murder trial (the "Singleton case"), which was in the news around the same time as his trial, and that the other case was brought up in jury deliberations.  The defendant in that trial was a 70-year-old man who committed a murder in Florida after being released from prison on parole after serving fourteen years.  In support of this claim, Thompson relies on an affidavit from the jury foreperson in his sentencing trial, Roger Dowdy, which Thompson put in the trial court record in 2005, seven years after trial.  The affidavit states:

> I was the jury foreman in the case of Commonwealth vs. William Eugene Thompson.

> In determining Mr. Thompson's sentence, the jury was afraid that Mr. Thompson might be released from prison if he was to receive anything less than a death sentence.

11

> During the time of the trial, there was another case in the news that the jury discussed during deliberations. A seventy year old man who committed a murder[2] in California had been released from prison on parole. This man, despite his age, then committed another murder in Florida. The jury was afraid that Mr. Thompson, even as an old man, would be a danger to society if released.
>
> An article about that other case is attached to this affidavit. Similar news pieces ran in the media available in Graves County.

Am. Pet. at 12 (citing post-conviction trial record at 26). Thompson also premised his post-conviction RCr 11.42 motion in Lyon Circuit Court on Dowdy's affidavit on this issue. The Lyon Circuit Court denied the motion without an evidentiary hearing. The Kentucky Supreme Court affirmed the denial on this issue on grounds that the argument was not properly brought in the RCr 11.42 motion because "[i]ssues that could have or should have been raised on direct appeal cannot be raised in a motion pursuant to RCr 11.42." *Thompson v. Commonwealth*, 2010 Ky. Unpub. LEXIS 99, at *11 (citing *Leonard v. Commonwealth*, 279 S.W.3d 151, 156 (Ky. 2009)).

In this habeas action, Thompson moved for an evidentiary hearing on this claim, as well as his ineffective-assistance-of-counsel claim. The Court granted the motion as to this claim only by Memorandum Opinion and Order (DN 30) entered May 2, 2012. Therein this Court concluded, as Respondent acknowledged on brief, that the instant claim was not procedurally defaulted because it was not a claim that could have or should have been raised on direct appeal, and Kentucky courts do allow such claims to be brought in RCr 11.42 motions. *See Bowling v.*

---

[2]The affidavit is incorrect on this point. The man in the Florida case was Larry Singleton. His previous crime was not murder. Singleton abducted and raped a hitchhiker in California and left her for dead after cutting off both her arms. Singleton was convicted and served fourteen years. After his release, he committed a murder in Florida at the age of seventy. Am. Pet.
at 12-13.

*Commonwealth*, 168 S.W.3d 2, 9-10 (Ky. 2004).  Because this claim was not adjudicated on the

merits in state court, the deference due under § 2254(d) therefore does not apply.  This Court

reviews the instant claim *de novo.  See Clinkscale v. Carter*, 375 F.3d at 436; *Maples v. Stegall*,

340 F.3d at 436.

In addition, in the Court's May 2, 2012, Memorandum Opinion and Order, the Court

concluded that it can consider juror testimony regarding "overt acts" of misconduct but cannot

consider evidence of the subjective effect of any extrajudicial matter on a juror.  *See United*

*States v. Jones*, 468 F.3d 704, 709 (10th Cir. 2006) ("[Q]uestioning of a juror who has been

exposed to extraneous information is limited to the circumstances and nature of the improper

contact, and questions bearing on the subjective effect of the contact on the juror's decision

making are prohibited.") (internal citation and quotation marks omitted).

### 2.    Evidentiary hearing

Turning to the evidentiary hearing which took place on June 14, 2012, Thompson called

one witness, foreperson Dowdy.  When Thompson's counsel asked whether there was any

discussion of another criminal case that was going on at the time of the trial, Dowdy testified:

> It was brought up probably after two or three votes or whatever that about the case
> in Florida was brought up at that time where a man has been paroled from prison and
> moved from California to Florida and committed murder again within a short period
> of time.  It wasn't even – I don't know how long.  I don't remember the details of it,
> but I just remember it was brought up and that was it.

Hr'g Tr. at 4.  When asked by Thompson's counsel who brought up the Singleton case, Dowdy

responded, "I don't – I don't have a clue.  Fourteen years, I don't –[.]"  *Id*.  He stated that it was

one of the other jurors.  *Id*.  When asked if there was a discussion about it, Dowdy testified as

follows:

13

> I don't – I don't have a clue right now.  It may have been.  It may have been.  I just know that – I know that it was probably a 9-to-3 or 8-to-4 . . . vote at that time, and there was three holdouts or whatever to the end until the last vote.  And it was probably brought up sometime during that period.

*Id*. at 5.  Thompson's counsel asked him if it was brought up among all the jurors, and Dowdy replied, "Well, I – don't know – yeah, all the jurors heard it because we was all in the room."  *Id*. About the Singleton case, he stated, "It was a man that was paroled after 20-something years in California and come to – moved to Florida and killed his neighbor after a short period, what I can remember of it."  *Id*.

Respondent's counsel asked Dowdy if the Singleton case was the only topic that was discussed by the jury, and Dowdy stated, "Oh, we discussed a lot.  We brought out the evidence several times.  It wasn't just – it wasn't just this piece here.  I mean, we brought out all – we had the box of evidence in there."  *Id.* at 8.  Further, he stated, "We sat in there for 10, 12 hours.  I don't – or better."  *Id*. at 9.

When Thompson's counsel asked Dowdy again about who brought up the story, he testified that he did not bring up the Singleton case himself.  *Id*. at 9.  When asked again if it was one of the other jurors who brought up the subject, he stated:

> Yes, I would think it was.  I don't – like I said, I don't know whether it was one of them women that was having trouble making up their minds or – some of them wouldn't vote.  I mean some of them said they didn't know for a long time and then – but I don't have a clue whether it was one of them or one of the other jurors.

*Id*. at 9-10.

The Court questioned Dowdy as follows:

| The Court: | Were there any newspaper articles or anything like that brought into the room? |
| Dowdy: | I don't think there was in there, no.  There wasn't – |
| The Court: | Just someone mentioned – |

14

| | |
|---|---|
| Dowdy: | Just somebody mentioned that it was – because it was prominent probably at that time.  I don't know.  It may have been.  It was probably prominent at that time. |
| The Court: | And only one juror brought it up? |
| Dowdy: | I guess they – I don't know whether one of them brought it up . . . |
| The Court: | You don't remember.  You don't remember what was said. |
| Dowdy: | – remember for sure whether it was said that way or – |
| The Court: | Did more than one juror bring up the article that they'd read? |
| Dowdy: | No. |

*Id.* at 10-11.

Thompson's counsel asked whether there was a discussion, and Dowdy testified, "There may have been a discussion about it at that time.  Like I said, we ate two meals in there, and we was there for 12 hours locked in there."  *Id.* at 11.  Dowdy also stated, "It may – it should have – it probably was at one end of the table or another.  At the other end of the table, there was several down there talking about it.  Or may have been over a meal.  I don't – right now, I don't know when.  It may have been while we was eating."  *Id.* at 13.

### 3.      Analysis

The Sixth and Fourteenth Amendments to the Constitution guarantee a criminal defendant the right to a trial by an impartial jury and a verdict based solely on the evidence. *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992); *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). A criminal defendant must be "afforded the right to confront the evidence and the witnesses against him, and the right to a jury that considers only the evidence presented at trial."  *Doan v. Brigano*, 237 F.3d 722, 733 n.7 (6th Cir. 2001) (citing *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966); *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965)), *abrogated on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003).  A juror must be "indifferent" and "his verdict must be based upon the evidence developed at trial."  *Irvin v. Dowd*, 366 U.S. at 723.  "A defendant's

Sixth Amendment rights are put in jeopardy when facts appear before a jury that were not developed at trial.  Such extraneous influence may threaten the guarantee of an impartial jury, and may trammel a defendant's right to confrontation and cross-examination."  *Gall v. Parker*, 231 F.3d 265, 334 (6th Cir. 2000) (internal citations omitted), *overruled on other grounds by Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003).

An "extraneous influence on a juror" is "'one derived from specific knowledge about or a relationship with either the parties or their witnesses.'"  *Garcia v. Andrews*, 488 F.3d 370, 376 (6th Cir. 2007) (quoting *United States v. Herndon*, 156 F.3d 629, 635 (6th Cir. 1998)).  Examples of extraneous influence include "'prior business dealings with the defendant, applying to work for the local district attorney, conducting an out of court experiment, and discussing the trial with an employee.'"  *Id.* (quoting *United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005)).  To prevail on this claim, the petitioner must show an extraneous influence that tainted the jury deliberations "with information not subject to a trial's procedural safeguards."  *United States v. Herndon*, 156 F.3d at 636.  In the Sixth Circuit, the petitioner "bears the burden of proving juror bias."  *United States v. Corrado*, 277 F.3d 528 (6th Cir. 2000) (citing *United States v. Zelinka*, 862 F.2d 92, 96 (6th Cir. 1988)).  Likewise, in Kentucky courts, juror bias "must be demonstrated by the moving party."  *Bowling v. Commonwealth*, 168 S.W.3d at 10.

Jurors are presumed to be impartial.  *See Irvin v. Dowd*, 366 U.S. at 723.  There is also a presumption that jurors follow instructions from the trial court, such as the instruction to decide the case impartially based on the evidence.  *See, e.g.*, *United States v. Rodgers*, 85 F. App'x 483, 486 (6th Cir. 2004).  "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation . . . .  Due process means a jury capable and

16

willing to decide the case solely on the evidence before it . . . ."  *Smith v. Phillips*, 455 U.S. 209,

217 (1982).  Moreover, "to allow verdicts to be attacked merely for casual jury-room references

on the basis of matters not in evidence would add unduly to the already fragile state of criminal

convictions."  *United States ex rel. Owen v. McMann*, 435 F.2d 813, 817 (2d Cir. 1970) (internal

citation omitted).  Thus, where no extraneous influence is present, courts will not intrude into

matters internal to jury deliberations.  Substantial policy considerations support this rule.

> There is little doubt that postverdict investigation into juror misconduct would in
> some instances lead to the invalidation of verdicts reached after irresponsible or
> improper juror behavior.  It is not at all clear, however, that the jury system could
> survive such efforts to perfect it.  Allegations of juror misconduct, incompetency, or
> inattentiveness, raised for the first time days, weeks, or months after the verdict,
> seriously disrupt the finality of the process.  Moreover, full and frank discussion in
> the jury room, jurors' willingness to return an unpopular verdict, and the
> community's trust in a system that relies on the decisions of laypeople would all be
> undermined by a barrage of postverdict scrutiny of juror conduct.

*Tanner v. United States*, 483 U.S. 107, 120-21 (1987) (internal citations omitted).

The Court notes this is not a case where a juror was exposed to media coverage of the

criminal case being tried, which, as both parties point out on brief, is the common situation

giving rise to extrajudicial-influence cases.  *See, e.g.*, *Mattox v. United States*, 146 U.S. 140,

150-51 (1892); *Zuern v. Tate*, 336 F.3d 478, 486 (6th Cir. 2003); *Goins v. McKeen*, 605 F.2d

947, 953 (6th Cir. 1979).  Nor does it involve exposure to media coverage about the defendant's

past criminal history.  *See, e.g.*, *Marshall v. United States*, 360 U.S. 310, 312 (1959).


The leading case in the area of extrajudicial influence on a jury is *Remmer v. United*

*States*, 347 U.S. 227 (1954).  In that case, during trial someone communicated with a juror who

later became the jury foreman that the juror could profit by bringing in a verdict for the

defendant. *Id.* at 228. The juror informed the judge, who advised the prosecutor of the contact but not the defendant's counsel. *Id.* When the defendant learned after trial of the contact, the trial court denied his motion for a new trial. *Id.* at 229. The Supreme Court reversed and held:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reason, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

*Id.* The Court set forth a procedure to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial . . . with all interested parties permitted to participate." *Id.* at 230.

However, Thompson's case is distinguishable from *Remmer* in a significant respect. Thompson does not allege that any juror was exposed to a private communication, contact, or attempt to tamper with the jury, directly or indirectly. The alleged exposure to outside information was a public communication, a published media account of the Singleton case. *See Green v. Andrews*, No. 1:07CV2093, 2008 U.S. Dist. LEXIS 113557, at *22 (N.D. Ohio May 30, 2008). Moreover, the discussion about the Singleton case came not from an outside party but occurred among the jurors themselves. *See Garcia v. Andrews*, 488 F.3d at 376.

To determine whether the extrajudicial influence alleged here warrants habeas relief, the Court turns to Dowdy's testimony at the evidentiary hearing. While Dowdy's memory of the deliberations was considerably faded, he testified that the Singleton case was "brought up" during the deliberations, which he stated lasted ten to twelve hours. He stated, "Just someone mentioned that it was – because it was prominent probably at that time. I don't know. It may have been. It was probably prominent at that time." He could not remember who brought it up,

18

when it was brought up, or what was said.  He did not even testify how the unknown juror learned of the Singleton case.  Dowdy's affidavit attaches an article about the case from the *St. Petersburg Times* newspaper and states, "[s]imilar news pieces ran in the media available in Graves County."  However, Dowdy did not testify whether the unknown juror even read an article about the case or learned about it through other means.  He testified that there was no newspaper article brought into the jury room but that one juror brought up the article.  When asked whether other matters were discussed as well, Dowdy stated, "Oh, we discussed a lot.  We brought out the evidence several times.  It wasn't just – it wasn't just this piece here.  I mean, we brought out all – we had the box of evidence in there . . . . We sat in there for 10, 12 hours."

Thompson asserts that the Singleton case was a topic of news at the time of the trial.  However, a juror's reading the news of the day does not necessarily give rise to extraneous information.  *United States v. Caro-Quintero*, 769 F. Supp. 1564, 1575 (C.D. Cal. 1991).  "The mere fact that local newspapers were in the jury room does not amount to extraneous influences on the jury.  It cannot even be characterized as extrinsic evidence."  *Id*. at 1575 (citing *United States v. Brewer*, 783 F.2d 841 (9th Cir. 1986)).

Moreover, based on Dowdy's testimony, the jury did not derive "specific knowledge about or a relationship with either the parties or their witnesses" from awareness or discussion of the Singleton case.  *Garcia v. Andrews*, 488 F.3d at 376 (quoting *United States v. Herndon*, 155 F.3d at 635).  Nor did Dowdy's testimony indicate that any juror had any personal knowledge of the parties, the witnesses, or the facts of the case.  *See Hard v. Burlington N. R.R. Co.*, 870 F.2d 1454, 1462 (9th Cir. 1989) ("It is expected that jurors will bring their life experiences to bear on the facts of a case. . . . While it is clearly improper for jurors to decide a case based on their

19

personal knowledge of facts specific to the litigation, a basic understanding of x-ray interpretation falls outside the realm of impermissible influence.") (internal citation omitted). The Singleton case was not related to Thompson's trial.  It did not involve any of the same parties, same witnesses, same court, or same facts in issue.  Moreover, the Singleton case was similar to Thompson's trial only in that it involved the crime of murder.  However, the facts and circumstances involved in the Singleton case, where a 70-year-old man committed murder shortly after being paroled, were not similar to the facts and circumstances in Thompson's case.

Furthermore, the Singleton case did not bring to bear or insert any "extra facts into the jury room" concerning Thompson's trial or penalty.  *Doan v. Brigano*, 237 F.3d at 734.  Taking Thompson's argument to its logical extension, he would suggest that the juror, in bringing up the Singleton case during deliberations, became a witness subject to cross-examination.  However, jurors, "whose duty it is to consider and discuss the factual material properly before them," do not "become 'unsworn witnesses' within the scope of the confrontation clause simply because they have considered any factual matters going beyond those of record."  *United States ex rel. Owen v. McMann*, 435 F.2d at 817.  "[J]urors can take into account their own wisdom, experience, and common sense . . . ."  *Doan v. Brigano*, 237 F.3d at 734.  A juror's discussion about a murder that occurred in another state is part of the personal experience every juror brings with him or her into the jury room.  The "mere fact of infiltration of some molecules of extra-record matter" does not warrant habeas relief.  *United States ex. rel. Owen v. McMann*, 435 F.2d at 818.  The fact that a juror may have brought up the Singleton case as an example of someone committing murder while on parole is not the type of extraneous judicial information that should be subject to the "judicial sieve."  *Doan v. Brigano*, 237 F.3d at 734.  A comment about the

20

possibility of Thompson committing a murder as a relatively old man if he were paroled is part of a "full and frank discussion in the jury room[.]"  *Tanner v. United States*, 483 U.S. at 120 (internal citation omitted).

Thompson primarily cites three cases which he contends are similar to the facts here and support his claim.  However, each of these cases can be distinguished.  In *Nevers v. Killinger*, 169 F.3d 352 (6th Cir. 1999), a criminal trial of white police officers for the beating death of an African American man, the extraneous influences alleged by the defendants were (1) the jury's viewing of the "racially provocative" movie *Malcolm X*, which was provided to the jury by the court for viewing in the jury room as entertainment during a break; (2) a juror learning from news reports about the city's preparing for a possible riot in the event of an acquittal; and (3) jurors' exposure to and consideration of information that the defendants themselves were members of an undercover unit called STRESS with a reputation of harassing African American youths.  *Id*. at 356, 369.  The Sixth Circuit granted habeas relief, finding that the "issue at the heart of Nevers's prosecution was not what Nevers did, but why he did it."  *Id.* at 372.  The court held that "[t]he extraneous information that the jury was exposed to during the course of the trial, and particularly the information regarding STRESS, unquestionably had the potential for influencing how the jury viewed Nevers's testimony about his motivation for beating Green . . . ."  *Id.*  The Sixth Circuit did not separately discuss the alleged exposure to the movie *Malcolm X* or to news reports of preparation for a possible riot.  Therefore, the Sixth Circuit's decision in *Nevers* turned on the jurors' consideration of information about the defendants themselves and its possible influence on the jury concerning one of the defendant's motive for the crime.

21

The extraneous influence alleged by Thompson, a juror's bringing up a separate crime that occurred in another state, is distinguishable from *Nevers*.  The alleged extraneous influence did not concern Thompson himself or implicate his motive for the crime.

The other cases relied on by Thompson can be distinguished because each involved the media item itself being brought into the jury room, rather than a discussion of the issue among jurors.  Thompson relies on *Waldorf v. Shuta*, 3 F.3d 705 (3d Cir. 1993).  However, in that case the Third Circuit found that the article "was physically present in the jury room just prior to the commencement of jury deliberations" and that jurors were "reading, commenting and circulating the article."  *Id.* at 711.  Thompson's reliance on *Wiley v. State*, 332 S.W.2d 725 (Tx. Crim. App. 1960), is also unpersuasive because the Texas Court of Criminal Appeals found that "one of the jurors handed a newspaper to the foreman and asked him to read aloud . . . [a] news story[.]"  *Id.* at 726.

The Court finds that Thompson has failed to meet his burden on this claim of error.  A discussion of a news story about an unrelated crime does not constitute extrajudicial evidence which would set aside a verdict.  Accordingly, the Court concludes that there was no extraneous influence on the jury which warrants habeas relief.  The Court denies relief on this claim of error.

**B.**     **Claim Two - Ineffective Assistance of Counsel**

Thompson next contends that his trial counsel was ineffective when, in closing argument of the penalty-phase trial, he referred to the possibility that Thompson would be eligible for parole in twenty-five years when in fact the Kentucky Parole Board had already decided that

Thompson would serve out his previous life sentence.  During closing arguments, Thompson's counsel stated as follows:

> We have a case now where it is not necessary to take a life.  He is going to die in prison in maximum security and as I said the first day, the question is:  is the State going to do it or is God going to take him?  Because he doesn't even think about the P word - the Parole Board - until he is about seventy-five years of age.  That is twenty-five New Years.  Twenty-five Thanksgivings.  Twenty-five Christmases.  I'd like to think [that] I will be retired by then, we may have a colony on Mars by then.  Twenty-five years.

Trial Tr. at 1281.

Thompson first raised this ineffective-assistance-of-counsel claim in his RCr 11.42 motion before the trial court.  The Lyon Circuit Court denied the ineffective-assistance claim without an evidentiary hearing.  The Kentucky Supreme Court affirmed on appeal.  *Thompson v. Commonwealth*, 2010 Ky. Unpub. LEXIS 99, at *11.  With regard to this claim, the Kentucky Supreme Court stated as follows:

> In an RCr 11.42 proceeding, the movant bears the burden of establishing that he was deprived of effective assistance of counsel.  *Commonwealth v. Bussell*, 226 S.W.3d 96, 103 (Ky. 2007).  To prevail on a claim of ineffective assistance of counsel, the movant must first show that counsel's performance was deficient, meaning that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Second, the movant must demonstrate that counsel's deficiency prejudiced the defendant.  *Id*.  This requires a showing that, but for counsel's unprofessional errors, the outcome of the trial would have been different.  *Id*. at 694.  We have also stated this standard as a determination of whether, absent counsel's errors, the jury would have had reasonable doubt with respect to guilt.  *Brown v. Commonwealth*, 253 S.W.3d 490, 499 (Ky. 2008).
>
> "In order to be ineffective, performance of counsel must be below the objective standard of reasonableness and so prejudicial as to deprive a defendant of a fair trial and a reasonable result."  *Haight v. Commonwealth*, 41 S.W.3d 436, 441 (Ky. 2001), *overruled on other grounds by Leonard v. Commonwealth*, 279 S.W.3d 151 (Ky. 2009).  "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]"  *Strickland*, 466 U.S. at 689.  In considering

23

an RCr 11.42 motion based on ineffective assistance of counsel claims, the trial court must evaluate counsel's performance in light of the totality of the circumstances and the trial as a whole.  *Strickland*, 466 U.S. at 695.  In an appeal from a decision on an RCr 11.42 claim, the reviewing court must defer to the determination of facts and credibility made by the trial court.  *McQueen v. Commonwealth*, 721 S.W.2d 694, 698 (Ky. 1986).

The comment in question . . . was made in the context of arguing against the imposition of the death penalty.  It was clearly made more to emphasize the probability of Thompson never getting out of prison than the possibility that he could someday be released from prison.  Nevertheless, in reviewing the record, we can see there were strategic reasons justifying defense counsel's reference to the possibility of Thompson being paroled after twenty-five years.  *See Hodge v. Commonwealth*, 116 S.W.3d 463, 473 (Ky. 2003), *overruled on other grounds by Leonard*, 279 S.W.3d 151 (Tactical decisions "will not be second guessed in an RCr 11.42 proceeding.").

Had defense counsel brought up the serve-out on Thompson's prior life sentence, that would have likely drawn more attention to Thompson's prior conviction for the 1972 murder for hire, and perhaps prompted the Commonwealth to place more emphasis on the prior murder conviction in arguing its case.  Further, the only defense offered by Thompson was that the murder of Cash was a spontaneous act, and not a calculated, premeditated act.  In support of this defense, defense counsel argued that Thompson was getting close to possibly being paroled on his prior conviction and therefore had nothing to gain from planning and carrying out the murder of Cash.  Presenting evidence of the serve-out on Thompson's prior conviction, although it was not ordered until 1993, would have contradicted this defense or confused the issue for the jury.

Also, at the time Thompson received the serve-out on his prior murder conviction, the Parole Board could have subsequently revisited the serve-out decision. 501 KAR 1:030, § 4(1)(d) (1993).  Hence, there was still a possibility that Thompson could be paroled on the prior conviction.

Defense counsel argued strongly and passionately to the jury to consider the mitigating factors and not to impose the death penalty in his closing argument in this case. During his closing argument he stated,

> The Commonwealth knows it is not necessary to kill because Eugene Thompson will die in prison. . . . He is going to die in prison in maximum security and as I said the first day, the question is:  is the State going to do it or is God going to take him?

In his opening statement, he stated unequivocally, "Eugene Thompson will die in prison and over the next several days, you will decide and the weight is on you to decide whether God will take him or the State will take him." As noted earlier, the responses elicited by defense counsel in his questioning of Thompson clarified that he had received a serve-out on his prior life sentence in 1993 and that he would "die in prison."

As for the affidavit of the juror claiming that the jury "was afraid that Mr. Thompson might be released from prison if he was to receive anything less than a death sentence" and "did not necessarily want to sentence Mr. Thompson to death," RCr 10.04 provides that a "juror cannot be examined to establish a ground for a new trial, except to establish that the verdict was made by lot." Thus, the self-serving affidavit produced over seven years after the trial cannot be used to establish Thompson's claim of ineffective assistance of counsel. *See Gall v. Commonwealth*, 702 S.W.2d 37, 44 (Ky. 1985) (rejecting juror's testimony as basis for defendant's claim that jurors improperly considered parole).

Appellant is not guaranteed errorless counsel or counsel that can be judged ineffective only by hindsight, but rather counsel rendering reasonably effective assistance at the time of trial. *Strickland*, 466 U.S. at 689; *see also Haight v. Commonwealth*, 41 S.W.3d at 442. From our review of the totality of the circumstances in this case, we cannot say that defense counsel's single remark regarding the possibility of Thompson being paroled constituted ineffective assistance of counsel in this case.

*Thompson v. Commonwealth*, 2010 Ky. Unpub. LEXIS 99, at *4-10.

The standard governing an ineffective-assistance-of-counsel claim is stated in *Strickland v. Washington*, 466 U.S. 668 (1984). As the Supreme Court stated in that case, the Sixth Amendment guarantees a criminal defendant the assistance of an attorney whose performance ensures a fair trial and a reliable result. *Id*. at 685-86. To prevail on an ineffective-assistance claim, a convicted defendant must prove that counsel's performance was deficient and that he suffered prejudice as a result. *Id*. at 687; *see also Foust v. Houk*, 655 F.3d 524, 533 (6th Cir. 2011). To demonstrate deficient performance, the defendant must prove that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of

25

reasonable professional assistance" and that "under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

To demonstrate prejudice, the defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  In other words, he must show a "'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 131 S. Ct. at 1403 (quoting *Harrington v. Richter*, 131 S. Ct. at 791).  The defendant must show that the errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.  "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, __ U.S. __, 130 S. Ct. 1473, 1485 (2010).

Because Thompson's ineffective-assistance claim was adjudicated on the merits by the Kentucky Supreme Court, § 2254(d) governs the standard of review.  Thompson can only succeed on this claim by showing that the Kentucky Supreme Court unreasonably applied *Strickland* to his claim.  When applying *Strickland* under § 2254(d), this Court's review of the performance prong is "'doubly deferential.'" *Cullen v. Pinholster*, 131 S. Ct. at 1403 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  The Court must "take a 'highly deferential' look at counsel's performance," *id.* (citing *Strickland*, 466 U.S. at 689), "through the 'deferential lens of § 2254(d).'" *Id.* (citing *Knowles v. Mirzayance*, 556 U.S. at 123 n.2).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 131 S. Ct. at 788.

26

### 1.      Performance

Thompson argues that trial counsel's "presentation of misinformation regarding [his]

parole eligibility" was deficient performance under the first prong of *Strickland*.  Am. Pet. at 20.

Under *Strickland*,

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too
> tempting for a defendant to second-guess counsel's assistance after conviction or
> adverse sentence, and it is all too easy for a court, examining counsel's defense after
> it has proved unsuccessful, to conclude that a particular act or omission of counsel
> was unreasonable.  *Cf. Engle v. Isaac*, 456 U.S. 107, 133-134 (1982).  A fair
> assessment of attorney performance requires that every effort be made to eliminate
> the distorting effects of hindsight, to reconstruct the circumstances of counsel's
> challenged conduct, and to evaluate the conduct from counsel's perspective at the
> time.  Because of the difficulties inherent in making the evaluation, a court must
> indulge a strong presumption that counsel's conduct falls within the wide range of
> reasonable professional assistance; that is, the defendant must overcome the
> presumption that, under the circumstances, the challenged action "might be
> considered sound trial strategy."  *See Michel v. Louisiana*, [350 U.S.] at 101.  There
> are countless ways to provide effective assistance in any given case.

*Strickland*, 466 U.S. at 689.  To establish that trial counsel's performance was deficient,

Thompson must establish that counsel's representation was objectively unreasonable and

overcome the "strong presumption" that his trial counsel made this decision "in the exercise of

reasonable professional judgment."  *Id*. at 690.  "When counsel focuses on some issues to the

exclusion of others, there is a strong presumption that he did so for tactical reasons rather than

through sheer neglect."  *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (citing *Strickland*, 466 U.S.

at 690).

Respondent contends that the Court does not have to presume what trial counsel's

strategy was.  He points to Thompson's own statements in the state court proceedings that it was

defense counsel's strategy not to argue the serve-out order in closing argument.  Respondent

27

points to a document Thompson filed in the RCr 11.42 proceeding, titled "Amendment Pursuant to CR 15.01," wherein Thompson stated:

> Since the original filing, Movant's counsel interviewed Movant's [defense] counsel, the Honorable Michael Williams.  Regarding this claim, Williams stated that the reason he did not pursue this line of mitigation was that the Parole Board's serve-out decision was one that could be revisited, which, at the time of trial, was true.  Hence, Williams felt he could not tenably argue that Movant truly had a serve out.

Answer at 20 (quoting trial court record at 55.)  Further, on appeal to the Kentucky Supreme Court, Thompson stated that "trial counsel's stated reason he did not pursue this line of mitigation was that the Parole Board's serve-out decision could be revisited."  Answer at 20 (quoting Appellant's Ky. Sup. Ct. Br., 09-SC-557, at 9).

At trial, Thompson testified on his own behalf.  On direct examination by defense counsel, Thompson testified as follows:

| Counsel: | Do you . . . do you understand that you are going to be staying in prison the rest of your life? |
|---|---|
| Thompson: | I will die in prison.  I have been in now for almost twenty-seven years.  I have no chance of ever getting out.  I finally went up for parole on the life sentence that I was originally doing in November of 1993 and at that time, the Parole Board give me a serve-out on a life sentence which means that I will die in prison. |

Trial Tr. at 1107 (ellipses in original).   There was no follow-up question to this response, and no testimony or documentary evidence from the Kentucky Department of Corrections evidencing the serve-out order was introduced into evidence.[3]  During closing argument, Thompson's trial counsel stated that, "The Commonwealth knows it is not necessary to kill because Eugene

---

[3]Thompson states in his traverse brief that he does not contend that his counsel was ineffective in not producing evidence of the serve-out.  He states that he only argues that his statement during closing argument constituted ineffective assistance.

Thompson will die in prison.  Did you ever hear anything different?"  Trial Tr. at 1260-61.

Immediately preceding the statements which Thompson disputes, trial counsel also stated, "We

have a case now where it is not necessary to take a life.  [Thompson] is going to die in prison in

maximum security . . . ."  *Id*. at 1281.  He also stated that Thompson would die in prison in his

opening argument.  *Id.* at 801.  Respondent contends that defense counsel's decision not to call a

member of the Parole Board or introduce documentary evidence of the serve-out order further

evinces that it was trial counsel's strategy not to argue Thompson's serve-out in closing

argument, rather than neglect or error.  Moreover, Respondent contends that defense counsel's

reference to Thompson not coming before the parole board for twenty-five years, when read in

the context of the entire closing argument, was made in reference to the second most severe

penalty the jury could impose, and that which defense counsel had urged at trial, life without the

possibility of parole for twenty-five years.

Thompson does not dispute that this was trial counsel's stated strategy.  However, he

claims that trial counsel's stated strategy "smacks of *post hoc* rationalization."  Traverse Br. at 8

(citing *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003)).  However, the *post hoc* rationalization

which the Supreme Court criticized in *Wiggins* was rationalization by the state court and

prosecutors concerning trial counsel's strategy "that contradicts the available evidence of

counsel's actions."  *Harrington v. Richter*, 131 S. Ct. at 790 (citing *Wiggins*, 539 U.S. at 526-

27).  There is no such evidence in the record that contradicts counsel's own statements

concerning his trial strategy.  Moreover, Thompson does not dispute that the serve-out was

revocable by the Parole Board at the time.

29

Based on a review of the record and there being no evidence to the contrary, trial counsel made a strategic decision not to emphasize the serve-out in closing argument. "[S]trategic choices made after thorough investigation of law and fact relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Moreover, counsel must have "wide latitude . . . in making tactical decisions." *Cullen v. Pinholster*, 131 S. Ct. at 1406 (citing *Strickland*, 466 U.S. at 689). It was not objectively unreasonable for trial counsel to avoid emphasizing the serve-out in closing argument, which would have allowed the prosecution to argue that the serve-out could be revisited by the Parole Board. Thompson does not dispute that at the time of his trial the Parole Board's serve-out order was revocable. To state that it was not would have subjected Thompson to rebuttal by the prosecution. While the Parole Board's reversal of its serve-out order may have been unlikely, opening the door to an argument that the Parole Board had the authority to revisit its serve-out order could have placed doubt in the jury's mind about the second harshest sentence it could have imposed, life without the possibility of parole for twenty-five years. *See Harrington v. Richter*, 131 S. Ct. at 790 ("[M]aking a central issue out of blood evidence would have increased the likelihood of the prosecution's producing its own evidence on the blood pool's origins and composition . . . ."). "So long as the jury receives accurate information, it may consider the possibility, speculative though it may be, that future decisions of state executive officials could lead to the defendant's early release." *Bedford v. Collins*, 567 F.3d 225, 235 (6th Cir. 2009); *see also California v. Ramos*, 463 U.S. 992, 1001-02 (1983) (holding that the Eighth and Fourteenth Amendments do not prohibit a jury instruction permitting a capital sentencing jury to consider the governor's power to commute a life sentence without possibility of parole). The fact that counsel's decision ultimately proved

30

unsuccessful does not mean that his representation was ineffective. *See Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) (finding that an ineffective-assistance-of-counsel claim "cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken").

Moreover, it was not unreasonable for the Kentucky Supreme Court to conclude that arguing the serve-out order could have focused more of the jury's attention on Thompson's prior murder-for-hire conviction or contradicted or confused Thompson's defense concerning lack of premeditation. While Thompson contends that this is speculation by the Kentucky Supreme Court, the state court's discussion of other tactical reasons for not arguing the serve-out is not unreasonable. As stated by the Supreme Court in *Cullen v. Pinholster*, the state court "was required not simply to give [the] attorneys the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons [trial] counsel may have had for proceeding as they did." *Cullen v. Pinholster*, 131 S. Ct. at 1407 (internal citation and quotation marks omitted).

In this case, by Thompson's own statement, counsel made a strategic decision not to argue the serve-out in closing argument. Thompson cannot overcome the strong presumption that his trial counsel rendered adequate assistance. Nor has Thompson shown that the Kentucky Supreme Court was objectively unreasonable in its application of *Strickland* in finding that counsel's performance was not deficient.

### 2. Prejudice

Even if Thompson could prove deficient performance, he must still demonstrate that the deficient performance prejudiced him, which requires him to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Strickland*, 466 U.S. at 694.  The Kentucky Supreme Court ruled that

Thompson could not show prejudice:

> Even if defense counsel's performance was deemed deficient for mentioning the possibility of Thompson being released on parole, given that Thompson killed Cash and escaped while he was incarcerated, it is unlikely that additional evidence of Thompson's serve-out would have held much sway in trying to convince the jury that Thompson being in prison for the rest of his life would be adequate to protect the public from Thompson.  The Commonwealth would most assuredly have argued that being incarcerated did not stop Thompson from killing an innocent man in 1986.
>
> Further, the Commonwealth presented strong evidence of aggravating factors in this case, and the jury specifically found the following aggravating factors:  the prior conviction of murder, the murder was committed while Thompson was incarcerated, and the victim was a corrections officer engaged in the performance of his duties at the time of his murder.  Thus, we believe that the jury would still have recommended the death penalty in this case absent his counsel's mention of the possibility of parole.

*Thompson v. Commonwealth*, 2010 Ky. Unpub. LEXIS 99, at *10-11.

Thompson contends that in not arguing the serve-out order in closing argument counsel

failed to present mitigation argument adequately.  He further argues that the Kentucky Supreme

Court only considered aggravating factors in its prejudice analysis and failed to consider the

mitigating factors.

In order to establish prejudice, "'the new evidence that a habeas petitioner presents must

differ in a substantial way–in strength and subject matter–from the evidence actually presented at

sentencing.'" *Tibbetts v. Bradshaw*, 633 F.3d 436, 444 (6th Cir. 2011) (quoting *Hill v. Mitchell*,

400 F.3d 308, 319 (6th Cir. 2005)); *see also Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir.

2006) (holding that "the failure to present additional mitigating evidence that is merely

cumulative of that already presented does not rise to the level of a constitutional violation").

Thompson's counsel stated in closing argument that Thompson would die in prison, he stated in

32

opening argument that Thompson would die in prison, and he elicited testimony from Thompson that the Parole Board had ordered him to serve out his life sentence on his prior conviction.  The Court finds that emphasizing the serve-out during the closing does not differ substantially from the evidence and argument presented to the jury.

Moreover, the Sixth Circuit distinguishes cases where counsel has totally failed to conduct an investigation or present evidence of mitigation and those where the petitioner is dissatisfied with counsel's presentation of mitigation:

> [T]he cases where this court has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have *totally* failed to conduct such an investigation.  In contrast, if a habeas claim does not involve a failure to investigate but, rather, petitioner's dissatisfaction with the degree of his attorney's investigation, the presumption of reasonableness imposed by *Strickland* will be hard to overcome.

*Beuke v. Houk*, 537 F.3d 618, 643 (6th Cir. 2008) (quoting *Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001)); *see also Moore v. Parker*, 425 F.3d 250, 255 (6th Cir. 2005); *cf. Wiggins v. Smith*, 539 U.S. at 534-35 (due to minimal investigation, counsel presented no evidence of defendant's family history, which included severe childhood abuse); *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003) (counsel failed to seek mitigating evidence and thus did not learn of defendant's unpleasant childhood); *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003) (counsel presented no mitigating evidence except defendant's one-sentence statement).

Here, even though the Kentucky Supreme Court did not discuss mitigating factors in its prejudice analysis, Thompson's trial counsel did not fail to produce evidence of mitigation.  Trial counsel presented compelling mitigation evidence, including extensive evidence of Thompson's troubled childhood, lack of a male role model, high temper and impulsiveness, and struggles in school, as well as expert testimony from Dr. Candace Walker, a psychiatrist from the Kentucky

33

Correctional Psychiatric Center, that Thompson was diagnosed with anti-social personality traits due to abnormal brain functioning.  However, there was also compelling evidence of aggravating factors.  The jury specifically found two aggravating factors–Thompson's prior conviction of murder and the victim was a corrections officer engaged in the performance of his duties–which were established from Thompson's guilty plea.  There was also evidence of the brutality of the murder and evidence that the murder was premeditated and intentional.

This Court does not find that the Kentucky Supreme Court's determination that Thompson did not suffer prejudice was "objectively unreasonably" to warrant habeas relief under the deferential standard of 28 U.S.C. § 2254.  For these reasons, Thompson's ineffective-assistance claim fails, and the Court will deny habeas relief as to this claim.

**C.      Claim Three – Improper Prosecutorial Argument**

Thompson next contends that his trial was tainted by improper prosecutorial argument during closing arguments in his penalty-phase trial.  He argues two claims of improper prosecutorial argument in his habeas petition.  He states that on direct appeal he argued other claims of improper argument, which he does not argue in this action.  However, Thompson states, "The others, while not necessarily improper in their own right, help to show why in totality the trial was unfair due to the prosecutor's statements."  Am. Pet. at 30.

Respondent argues that Thompson's prosecutorial misconduct claim "was not preserved for review" in his direct appeal and was not raised in his RCr 11.42 motion as a claim of ineffective assistance of counsel for failing to object to the prosecutor's challenged statements. Answer at 32.  However, Respondent also states that "it appears no 'claim in the petition is barred by a failure to exhaust state remedies, a procedural bar, non-retro-activity, or a statute of

limitations.'"  Answer at 2 (quoting Rule 5(b) of the Rules Governing Section 2254 Cases in the United States District Courts).  Thompson did in fact raise both claims of improper prosecutorial argument in his direct appeal.  Appellant's Ky. Sup. Ct. Br., 98-SC-27, at 84, 87.  These claims were adjudicated by the Kentucky Supreme Court on the merits, and the deference requirements of 28 U.S.C. § 2254(d) apply.

Thompson states that the prosecutor's improper arguments were as follows:

> But there's also a burden that is being borne today and that is as a Commonwealth Attorney representing a person who is not here today – an empty chair – Charles Fred Cash taken from us by this man – this killer.  This is a burden that is very very heavy.  As a representative of the Commonwealth to speak on behalf of one that has been murdered.  I am the last one on this earth to speak on behalf of Mr. Cash.

Am. Pet. at 32 (quoting Trial Tr. at 1254).  Thompson argues that these comments improperly created the impression that the prosecution was acting on behalf of the victim, rather than seeking justice on behalf of the Commonwealth.  With regard to this claim of error, the Kentucky Supreme Court stated as follows:

> Of course, a Commonwealth's Attorney is just that – a representative of the Commonwealth, not the victim, and it is improper for the Commonwealth's Attorney to suggest otherwise.  Nonetheless, while perhaps approaching the line of impropriety, we conclude that these statements fall within the wide latitude afforded attorneys in presenting closing arguments.

*Thompson v. Commonwealth*, 147 S.W.2d at 46.  Thompson also contends that the following argument was improper:

> Like I have said before, the Commonwealth has done the best it can.  It has done all it can . . . I have tried to introduce the evidence as best as I could and this is something that I did not take lightly and I have never done this before – standing before a group of jurors asking that the ultimate penalty be imposed.

Am. Pet. at 32 (ellipses in original) (quoting Trial Tr. at 1256-57).  Thompson contends that this argument suggested to the jury that the prosecutor and law enforcement officers involved in

preparing the prosecutor's case had some expertise that the jurors did not have and that it had the effect of infringing upon the jury's decision-making authority.  Thompson argues that by telling the jury that this was the only time he sought the death penalty, the prosecutor suggested that this was the worst case he had ever prosecuted.  As to this claim of error, the Kentucky Supreme Court stated, "Nor do we agree with Appellant's assertion that the jury's decision-making authority was infringed upon.  We find no error."  *Thompson v. Commonwealth*, 147 S.W.2d at 47.

This Court must review Thompson's prosecutorial misconduct claims under the standard set forth in *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  In evaluating a claim of prosecutorial misconduct, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned."  *Id*. at 181 (internal citation and quotation marks omitted).  "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Id*. (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).  Therefore, prosecutorial misconduct will form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances.  *Donnelly*, 416 U.S. at 643-45.  The standard under *Darden* is "a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations[.]'"  *Parker v. Matthews*, __ U.S. __, 132 S. Ct. 2148, 2155 (2012) (ellipses in original) (quoting *Yarborough v. Alvarado*, 541 U.S. at 664); *see also Harrington v. Richter*, 131 S. Ct. at 786 ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.") (quoting *Yarborough v. Alvarado*, 541 U.S. at 664).  Moreover, "the appropriate standard of review for such a claim on writ of habeas corpus is 'the

narrow one of due process, and not the broad exercise of supervisory power[,]'" as would apply

to a case on direct review. *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 642).

With regard to the prosecutor's statements in closing argument, the Court agrees with the

Kentucky Supreme Court that the first disputed statement was likely improper. *See Frazier v.*

*Huffman*, 343 F.3d at 793 (holding that the "placing of an empty chair before the jury during the

prosecutor's closing argument to 'represent' the victim was 'improper'"). The second disputed

statement was also likely improper. A prosecutor may not express a personal opinion

concerning the guilt of the defendant or the credibility of witnesses "because such personal

assurances of guilt or vouching for the veracity of witnesses by the state's representative exceeds

the legitimate advocate's role by improperly inviting the jurors to convict the defendant on a

basis other than a neutral independent assessment of the record proof." *Caldwell v. Russell*, 181

F. 3d 731, 737 (6th Cir. 1999) (internal citations omitted).

However, regardless of whether these statements by the prosecutor were improper, in

order to warrant habeas relief, the statements must have so infected the trial with unfairness as to

make Thompson's conviction a denial of due process. *Darden*, 477 U.S. at 181. To determine

whether the statements warrant habeas relief, the prosecutor's comments must be viewed in the

context of the entire proceeding, and inappropriate prosecutorial comments, standing alone, will

not justify reversal of a criminal conviction obtained in an otherwise fair proceeding. *United*

*States v. Young*, 470 U.S. 1, 11-12 (1985); *United States v. Bond*, 22 F.3d 662, 667 (6th Cir.

1994).

Reading the prosecutor's closing argument in its entirety, the prosecutor's argument "did

not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused

such as the right to counsel or the right to remain silent." *Darden*, 477 U.S. at 182 (internal citation omitted). These statements were not "'so pronounced and persistent that [they] permeate[d] the entire atmosphere of the trial or so gross as probably to prejudice the defendant.'" *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964) (6th Cir. 1997)); *see also Donnelly*, 416 U.S. at 639. The prosecutor's closing argument included a long recitation of the evidence showing premeditation and a discussion of the aggravating factors presented. Each of the statements was brief and isolated. As such, "they do not appear to have been the product of a deliberate attempt to mislead the jury." *United States v. Tosh*, 330 F.3d 836, 842 (6th Cir. 2003). Moreover, in concluding his argument, the prosecutor emphasized that the jury must decide the sentence based upon the evidence. He stated, "I'm going to turn it into your hands but I ask that when you go back there, you look at those exhibits and you consider all of the evidence and you write those three aggravators down on Verdict From Number Four . . . ." Trial Tr. at 1258.

Thompson identifies other statements which he contends were not improper in their own right but when taken together with other statements show that the trial was unfair. However, having reviewed the record and taking into account the jury's finding of two aggravating factors and the strong evidence of premeditation, this Court finds that Thompson has failed to demonstrate that the Kentucky Supreme Court's decision regarding any of the prosecutor's statements was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court. For these reasons, the Court denies habeas relief on this claim of error.

## D.     Claim Four - Inability to Question Jury

Thompson's next claim for relief is that the trial court erred in denying him an opportunity for meaningful *voir dire* of prospective jurors' potential impartiality as required by *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Thompson states that his defense counsel sought to ask the jury the following question of potential jurors during *voir dire*:

> If you sat as a juror and if you heard the evidence of aggravation and mitigation, and if you find that the Defendant has been convicted of a capital offense and the State has proven the aggravators, would you automatically vote for the death penalty in this or any case?

Am. Pet. at 37 (quoting Trial Tr. at 540). The trial court responded to defense counsel as follows:

> You are still asking the juror to commit to answering the question as to a verdict without having heard any mitigating evidence. The juror doesn't know what they are talking about – about mitigating evidence. They know that . . . They know the areas of aggravating evidence. The Court has identified that for them . . . So your [the Commonwealth's] objection is sustained.

*Id*. at 37 (ellipses in original) (quoting Trial Tr. at 541).

Thompson states that the trial court asked prospective jurors variations of the following question:

> In cases where the offense is capital murder and the punishment prescribed by law gives juries some options, there are four possible verdicts that the jury can consider and impose. The first is a sentence of not less than twenty years in the penitentiary. It can be more than twenty but not less than twenty. Secondly, a life sentence; third, life without the possibility of parole for twenty-five years and fourth is the death penalty. For a jury to consider and impose the last two forms of punishment, the jury must find from the evidence in the case, beyond a reasonable doubt, that certain aggravating circumstances existed at the time of the offense. In this case, the Commonwealth has identified areas that it intends to present evidence to the jury of aggravating circumstances. One, that Mr. Thompson, the defendant had a conviction for murder on his record at the time of the offense. Two, at the time of the offense, Mr. Cash was an employee of the prison as a prison guard and in the performance of his duties; and thirdly at the time of Mr. Cash's death, there was a robbery in connection with the offense. In addition to that evidence of aggravating circumstances, you will also hear evidence of mitigating circumstances. As a

> [prospective] juror in this case, can you consider all of the evidence in reaching your verdict in this case, that is to say, evidence of aggravating circumstances and evidence of mitigating circumstances?

Am. Pet. at 36-37 (quoting Trial Tr. at 532-33).

Thompson contends that by not being allowed to ask jurors his proposed question his counsel did not have sufficient information about the jurors' views on the death penalty to make valid decisions regarding challenges for cause and peremptory challenges.  He argues that his defense counsel could not be sure that a juror who responded affirmatively to the trial court's question was stating "that he or she would seriously consider any and all of the sentences less than death in every case in which a jury had convicted a defendant of intentional murder and in which the aforementioned aggravators had been found beyond a reasonable doubt."  Am. Pet. at 38.  Since Thompson had already pleaded guilty to murdering Fred Cash, a prison guard who was on duty when he was killed, while Thompson was incarcerated for murder, he argues that two aggravating factors were already established.  He contends that he was prevented from learning whether prospective jurors were in fact impartial or whether they would automatically vote for the death penalty upon proof beyond a reasonable doubt of the aggravating factors.

The Kentucky Supreme Court addressed this issue as follows:

> Appellant also claims that he was not afforded the opportunity to adequately question jurors about their attitude towards the death penalty in light of the aggravators presented by the Commonwealth.  The trial court did ask the prospective jurors whether they could consider the full range of penalties for Appellant where evidence would be presented of three aggravating factors, in addition to evidence of mitigating circumstances.  Appellant requested the court to ask the jurors a slightly different question regarding their attitude towards the death penalty:  that is, if they would automatically impose the death sentence if the three aggravators were proven beyond a reasonable doubt.  The trial court denied defense counsel's request, determining that the proposed question impermissibly asked a prospective juror to commit to a verdict before hearing the evidence.  The trial court also noted that it felt that the proposed question was essentially a re-wording of questions already being posed.

Appellant claims that the trial court's ruling denied him due process of law because he was not able to intelligently exercise his peremptory challenges and challenges for cause in striking prospective jurors.

Appellant's reliance on *Morgan v. Illinois*[, 504 U.S. 719 (1992),] is misplaced.  In *Morgan*, it was determined that the defendant should have been permitted to inquire whether a prospective juror would automatically impose the death penalty upon conviction; *i.e.*, if the prospective juror would recommend death regardless of any evidence in mitigation, so long as the defendant was proven guilty beyond a reasonable doubt.  The question actually posed by the trial court in *Morgan* – that is, whether a prospective juror would "follow the instructions on the law" – was insufficient to satisfy the due process right to make meaningful inquiry into jurors' biases and views towards the death penalty. [*Id.* at 723.]  *Morgan* concerns itself with the defendant's right to make inquiry; it does not set forth an affirmative right to ask certain specific questions of prospective jurors, as Appellant asserts.  Where a defendant is seeking to determine prospective jurors' attitudes towards the death penalty, "it would be a game of semantics, not law, to conclude that the failure to phrase a question in a specific way is fatal where other questions are equally illuminating."  [*McQueen v. Scroggy*, 99 F.3d 1302, 1330 (6th Cir. 1996).]

Here, Appellant's proposed question seeks to determine whether a prospective juror is so biased in favor of the death penalty, that he or she would automatically impose it upon a finding of aggravating circumstances.  Essentially, Appellant was seeking to determine whether a prospective juror would consider evidence in mitigation, even where aggravating factors existed.  We conclude that the permitted *voir dire* was sufficient and thorough enough to elicit the information sought by Appellant.  After reciting the aggravating circumstances in the case, defense counsel asked the *voir dire* panel if "those facts that you will find make you believe that maybe there's already an opinion in your mind or in your head about what needs to be done?"  Defense counsel was permitted to ask each juror whether he or she could consider all ranges of penalties.  The trial court also engaged in questioning concerning jurors' attitudes towards the death penalty, specifically asking jurors whether they would consider all range of penalties in light of the evidence and whether they had already formed an opinion based on the preliminary facts presented (which included a synopsis of the circumstances of the crime and the aggravators to be applied in the case).

The extent of and scope of direct questioning during *voir dire* examination is a matter within the sound discretion of the trial court.  [*Tamme v. Commonwealth*, 973 S.W.2d 13, 37 (Ky. 1998).]  The trial court determined that the information sought by Appellant was already being elicited by other questions, and the record supports this conclusion.  We find no abuse of discretion.

*Thompson*, 147 S.W.3d at 52-53 (footnotes omitted).

41

Thompson argues that the Kentucky Supreme Court's conclusion that Thompson's question was merely a slight variation of the question posed by the trial court was incorrect. Specifically, Thompson states that his counsel "wanted to determine whether, after the jurors determined that the Commonwealth had *proven* the existence of the aggravating circumstances, whether the jurors would then automatically impose death regardless of the mitigating evidence or even if there was a distinct lack of mitigating evidence." Am. Pet. at 41. He further argues that the importance of the trial court's inquiry regarding impartiality was "likely lost beneath the question's mountain of verbiage." Am. Pet. at 41. He asserts that the Kentucky Supreme Court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding and involved an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d).

Respondent counters that Thompson seeks to expand the Supreme Court's ruling in *Morgan v. Illinois*, 504 U.S. 719, too broadly. He argues that the issue in *Morgan v. Illinois* was the accused's ability to challenge potential jurors who would unwaveringly impose the death penalty after a finding of *guilt* and that Thompson fails to cite a single case that applies *Morgan v. Illinois* as Thompson seeks to apply it in the context of a sentencing hearing where guilt of the underlying crime is not at issue.

The Supreme Court has made clear that the trial court is entitled to deference in the process of jury selection "because [the trial judge] is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Uttecht v. Brown*, 551 U.S. 1, 7 (2007); *see also Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981) (declaring that trial judges have

42

"ample discretion in determining how best to conduct the *voir dire*").  This deference applies to trial courts faced with determining potential juror bias in death penalty trials.  *See id.*; *Wainwright v. Witt*, 469 U.S. 412, 426 (1985); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984). Consequently, the Supreme Court has directed that the lower courts "respect the limited role of federal habeas relief in this area."  *Uttecht*, 551 U.S. at 10.  Moreover, § 2254(d) adds an additional layer of deference to the trial judge by requiring a court on habeas review to view the state appellate court's decision through a "deferential lens."  *Pinholster*, 131 S. Ct. at 1403 (internal citation and quotation marks omitted).

For an inquiry in *voir dire* "[t]o be constitutionally compelled . . . it is not enough that such [*voir dire*] questions might be helpful.  Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair."  *Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991) (citing *Murphy v. Florida*, 421 U.S. 794, 799 (1975)).  The Constitution does not dictate a particular *voir dire* process; it demands only that the process be "adequate . . . to identify unqualified jurors."  *Morgan v. Illinois*, 504 U.S. at 729.  To be adequate, *voir dire* need not establish juror partiality with "unmistakable clarity."  *Wainwright v. Witt*, 469 U.S. at 424.  It must only be sufficient to permit a trial judge to form "a definite impression that a prospective juror would be unable to faithfully and impartially apply the law."  *Id.* at 426.

Thompson argues that his proposed questioning should have been allowed under *Morgan v. Illinois*, 504 U.S. 719.  The Supreme Court held in that case that a defendant facing imposition of the death penalty must be permitted on *voir dire* to ascertain whether prospective jurors would vote to "impose death regardless of the facts and circumstances of conviction."  *Id.* at 735.  The trial court in *Morgan* had posed variations of the following questions on *voir dire*:  "Would you

43

follow my instructions on the law even though you may not agree?"; "Do you know any reason why you cannot be fair and impartial?"; and "Do you feel you can give both sides a fair trial?" *Id.* at 723-24. The Supreme Court rejected these "general questions of fairness and impartiality" as insufficient to reveal potential bias toward the death penalty. *Id.* at 735-36. The Supreme Court stated that a juror "who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Id.* at 729. However, the Supreme Court did not set forth specific questions that must be asked in *voir dire* to determine whether juror bias exists. *Id.* ("The Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury.").

Having reviewed the entire *voir dire* in Thompson's trial, the Court concludes that the *voir dire* was adequate to seat an impartial jury. While Thompson might have preferred more specific inquiry into possible bias toward the death penalty, the trial court allowed enough questioning for Thompson's counsel to select an impartial jury. Defense counsel informed the venire panel that two of the aggravating factors – that Thompson was convicted of a prior murder and that the victim was a prison guard who was engaged in the performance of his duties at the time of the murder – would be established since Thompson had pleaded guilty to the murder. In individual *voir dire* of each prospective juror, the trial court described the four possible penalties and the three aggravating factors which would be put forth. The judge then asked each juror a question similar to the following: "So, those are the three aggravating factors. You will also hear evidence of mitigating circumstances. Can you consider all the evidence in reaching your decision this case?" Trial Tr. at 248. However, the inquiry did not end there. The

44

trial court then asked slight variations of the following four questions of each potential juror in follow up:

> Can you consider and impose, based on the evidence you find and the court's instructions the entire range of punishment from a period of years of not less than twenty all the way to capital punishment?[;]
>
> Is there any of those penalties which you would automatically exclude regardless of the evidence?[;]
>
> Is there any . . . are there any of those penalties that you would automatically say should be imposed in this case based on what you know now?[; and]
>
> Do you have a personal feeling that there is any type of crime for which the law should automatically prescribe capital punishment?

*Id.* at 249 (ellipses in original).

Therefore, the trial court asked each prospective juror in individual *voir dire* whether he or she would automatically impose any of the listed penalties based on what the jurors knew at that point. Defense counsel had already informed jurors that two of the aggravators would be proven based on Thompson's guilty plea. In addition, at defense counsel's request, the trial court asked each potential juror if he or she believed there was any type of crime for which the death penalty should be imposed automatically. Thus, it was not unreasonable for the Kentucky Supreme Court to find that the questioning in *voir dire* was sufficient to allow Thompson "to ascertain whether his prospective jurors . . . had predetermined . . . whether to impose the death penalty." *Morgan v. Illinois*, 504 U.S. at 736.

Therefore, the Kentucky Supreme Court's resolution of this claim was not contrary to or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; nor was its ruling on this issue based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding.  The Court therefore denies habeas relief on this claim of error.

**E.      Claim Five – Jury Instructions**

Thompson next argues that, because the jury instructions stated that the verdict must be unanimous but were silent as to the whether the finding of mitigating circumstances had to be unanimous, the jury instructions improperly implied that the finding of mitigating factors had to be unanimous in violation of *Mills v. Maryland*, 486 U.S. 367, 384 (1988).  Thompson argues that an instruction permitting non-unanimity should have been given.  As the Kentucky Supreme Court adjudicated this claim of error on the merits, the standard of review under § 2254(d)(1) applies to this claim.  The relevant portions of the jury instructions are as follows:

INSTRUCTION NUMBER ONE:

The Defendant has previously pled guilty to the murder of Charles Fred Cash.  From the evidence placed before you in [the] sentencing trial, you were acquainted with the facts and circumstances of the crime itself.  You shall now determine whether there are mitigating or aggravating facts and circumstances bearing upon the question of punishment, following which you shall fix a sentence for the defendant. In considering such evidence as may be unfavorable to the Defendant, you will bear in mind that the law presumes a Defendant to be innocent unless and until you are satisfied from the evidence beyond a reasonable doubt that he is guilty.  You shall apply the same presumption in determining whether there are aggravating circumstances bearing upon the question of what punishment should be fixed for the defendant in this case.

INSTRUCTION NUMBER TWO ENTITLED MITIGATING CIRCUMSTANCES:

In fixing a sentence for the defendant for the offense of murder, you shall consider such mitigating or extenuating facts and circumstances as has [sic] been presented to you in the evidence and you believe to be true, including but not limited to such of the following as you believe from the evidence to be true . . . In addition to the foregoing, you shall consider those aspects of the defendant's character, background and those facts and circumstances of the particular offense of which he is guilty, to-wit:  the murder of Charles Fred Cash, about which he has offered evidence in

46

mitigating [sic] of the penalty to be imposed upon him and which you believe from the evidence to be true.

INSTRUCTION NUMBER THREE ENTITLED AGGRAVATING CIRCUMSTANCES:

In fixing a sentence for the defendant for the offense of murder, you shall consider the following aggravating circumstances which you believe from the evidence beyond a reasonable doubt to be true . . .

INSTRUCTION NUMBER FOUR ENTITLED AUTHORIZED SENTENCES:

You may fix the Defendant's punishment for the murder of Charles Fred Cash at Number One:  Confinement in the penitentiary for a term of twenty years or more; or Two:  Confinement in the penitentiary for life; or Three:  Confinement in the penitentiary for life without benefit of probation or parole until he has served a minimum of twenty-five years of his sentence; or Four:  Death.  But you cannot fix his sentence at death or confinement in the penitentiary for life without benefit of probation or parole until he has served a minimum of twenty-five years of his sentence unless you are satisfied from the evidence beyond a reasonable doubt that one of the statements listed in Instruction Number Three – Aggravating Circumstances – is true in its entirety, in which event you must state in writing, signed by the Foreperson, that you have found the aggravating circumstances to be true beyond a reasonable doubt.  But even if you have found the aggravating circumstance or circumstances to be true beyond a reasonable doubt, you may still impose any of the four punishments for Murder as listed below.

INSTRUCTION NUMBER FIVE – REASONABLE DOUBT:

If you have a reasonable doubt as to the truth or existence of any aggravating circumstance listed in Instruction Number Three, you shall not make any finding with respect to it.  If, upon the whole case, you have a reasonable doubt as to whether the defendant should be sentenced to death, you shall instead fix his punishment at a sentence of imprisonment.

INSTRUCTION NUMBER SIX – UNANIMOUS VERDICT:

The verdict of the Jury must be in writing, must be unanimous and signed by one of you as Foreperson.

Trial Tr. at 1237-41.

The trial court attached to the jury instructions a Verdict Form setting forth four possible verdicts, numbered one to four.  *Id.* at 1242-43.  For numbers one and two, the form stated, "We, the jury, fix the Defendant, William Eugene Thompson's punishment for the murder of Charles Fred Cash at . . . ."  Possible verdict number one listed "confinement in the penitentiary for a term of ___ years (not less than twenty)[,]" and possible verdict number two listed "confinement in the penitentiary for life."  *Id.* at 1242.  After each of the first two possible verdicts, there was a space for the jury foreperson to sign if either was the verdict selected by the jury.  *Id.* at 1242.

For possible verdict number three, the form stated, "We, the jury find beyond a reasonable doubt that the following aggravating circumstance or circumstances existed or exist in this case . . . ."  *Id.*  The trial court instructed that, "there is a blank space at that point in the verdict form if the jury finds that to be the case, according to the instructions in the verdict form where the foreperson must write in the aggravating circumstance or circumstances the jury has found to be true beyond a reasonable doubt from the evidence in this case."  After the blank space, the form states, "and fix the sentence of the defendant for the murder of Charles Fred Cash at confinement in the penitentiary for life without benefit of probation or parole until he has served a minimum of twenty-five years of his sentence."  *Id.* at 1243.  After that there was a space for the jury foreperson to sign if that was the verdict selected by the jury.

For possible verdict number four, the form stated, "We, the jury find beyond a reasonable doubt that the following aggravating circumstance or circumstances exist in this case."  *Id.* at 1243.  The trial court explained that for this verdict there was also a blank space for the jury to "write in what aggravating circumstance or circumstances you have found to be true from the evidence beyond a reasonable doubt."  After the blank space, the form stated, "and we fix the

48

sentence of the defendant, William Eugene Thompson, for the murder of Charles Fred Cash at

death."  After that there was a place for the foreperson to sign if that was the jury's selected

verdict.

The Kentucky Supreme Court addressed this claim as follows:

> Appellant first maintains that, because the jury was informed that its verdict must be
> unanimous, the jury could have mistakenly believed that it was required to find the
> existence of mitigating factors unanimously as well, before such factors could be
> considered in arriving at a verdict.  He argues that such an instruction permitting
> non-unanimity should have been given, and that the failure to so instruct the jury
> rendered its verdict so unreliable as to require reversal.  This issue was not
> preserved; however, no such instruction was required and therefore, no error
> occurred.[FN75]
>
> > [FN75]*Tamme v. Commonwealth*, 973 S.W.2d 13, 37 . . . ([Ky. ]1998)
> > ("The instructions did not imply that unanimity was required on
> > mitigators and there is no requirement that a jury be instructed that
> > their findings on mitigation need not be unanimous."); *see also*
> > *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1121 (6th Cir. 1990).

*Thompson*, 147 S.W.3d at 47-48.

"The Eighth Amendment requires that the jury be able to consider and give effect to all

relevant mitigating evidence" offered by the defendant.  *Boyde v. California*, 494 U.S. 370,

377-78 (1990) (citing, *inter alia*, *Lockett v. Ohio*, 438 U.S. 586 (1978)).  "[I]n a capital case 'the

sentencer [may] not be precluded from considering, *as a mitigating factor*, any aspect of a

defendant's character or record and any of the circumstances of the offense that the defendant

proffers as a basis for a sentence less than death.'"  *Mills v. Maryland*, 486 U.S. at 374 (quoting

*Eddings v. Oklahoma*, 455 U.S. 104, 110 (1985)).  To that end, it is unconstitutional for a state to

require jurors to unanimously agree on mitigators.  *See McKoy v. North Carolina*, 494 U.S. 433,

443-44 (1990) ("*Mills* requires that each juror be permitted to consider and give effect to

mitigating evidence when deciding the ultimate question whether to vote for a sentence of

49

death.").  However, the Constitution does not require a state to adopt specific standards for instructing the jury in its consideration of mitigating factors under a death penalty scheme.  *Zant v. Stephens*, 462 U.S. 862, 884-91 (1983).  Kentucky has chosen not to require the trial judge to instruct the jury that its findings on the existence of any particular mitigating factor does not have to be unanimous.  *Meece v. Commonwealth*, 348 S.W.3d 627, 719 (Ky. 2011); *Stopher v. Commonwealth*, 57 S.W.3d 787, 803 (Ky. 2001).  Still, regardless of state law requirements, the Constitution forbids a trial court from instructing a jury that it has to reach a unanimous decision on the existence of any mitigating factor.  *Mills v. Maryland*, 486 U.S. at 384.  Further, sentencing instructions are constitutionally invalid if they create a substantial likelihood that reasonable jurors might think that they are precluded from considering any mitigating evidence unless jurors unanimously agree that the mitigator is proven.  *Adbur'Rahman v. Bell*, 226 F.3d 696, 711 (6th Cir. 2000) (citing *Mills v. Maryland*, 486 U.S. at 384).

In *Mills v. Maryland*, the verdict form stated, "Based upon the evidence we *unanimously* find that each of the following mitigating circumstances which is marked 'yes' has been proven to exist . . . and each mitigating circumstance marked 'no' has not been proven . . . ."  *Mills v. Maryland*, 486 U.S. at 387 (emphasis added).  The verdict form contained a list of seven potentially mitigating circumstances and an eighth marked "other."  *Id.*  Next to each was written "yes" or "no," and the jury was to indicate its finding.  *Id.*  Thus, the jury instructions and verdict form rejected by the Supreme Court stated directly that the jury could not find a particular circumstance to be mitigating unless they unanimously concluded that the mitigating circumstance had been proven.

50

The jury instructions and verdict form used in Thompson's trial differ significantly from those used in *Mills v. Maryland*.  The instructions and verdict form in the instant case did not directly state that the jury's finding of any mitigating factor had to be unanimous but were in fact silent as to whether the mitigating factors had to found unanimously.  Thompson cites no Supreme Court case which applies *Mills v. Maryland* in the context at issue.  The instructions and verdict form in this case are more similar to those presented in *Smith v. Spisak*, 558 U.S. 139, __, 130 S. Ct. 676, 683-84 (2010), wherein the Supreme Court found penalty-phase jury instructions which were likewise silent as to whether the jury must be unanimous in finding mitigating factors were not improper under *Mills v. Maryland*.  The jury instructions in that case were as follows:

> [Y]ou, the trial jury, must consider all of the relevant evidence raised at trial, the evidence and testimony received in this hearing and the arguments of counsel.  From this you must determine whether, beyond a reasonable doubt, the aggravating circumstances, which [Spisak] has been found guilty of committing in the separate counts are sufficient to outweigh the mitigating factors present in this case.

> If all twelve members of the jury find by proof beyond a reasonable doubt that the aggravating circumstance in each separate count outweighs the mitigating factors, then you must return that finding to the Court.

> . . . . .

> On the other hand, if after considering all of the relevant evidence raised at trial, the evidence and the testimony received at this hearing and the arguments of counsel, you find that the State failed to prove beyond a reasonable doubt that the aggravating circumstances which [Spisak] has been found guilty of committing in the separate counts outweigh the mitigating factors, you will then proceed to determine which of two possible life imprisonment sentences to recommend to the Court.

> The judge gave the jury two verdict forms for each aggravating factor. The first of the two forms said:

>> "We the jury in this case . . . do find beyond a reasonable doubt that the aggravating circumstance . . . was sufficient to outweigh the

51

> mitigating factors present in this case. . . .  We the jury recommend
> that the sentence of death be imposed . . . ."

The other verdict form read:

> "We the jury . . . do find that the aggravating circumstances . . . are
> not sufficient to outweigh the mitigation factors present in this case
> . . . We the jury recommend that the defendant . . . be sentenced to
> life imprisonment . . . ."

*Smith v. Spisak*, 130 S. Ct. at 683-84 (internal citations omitted).  The Supreme Court held that

these instructions did not violate *Mills v. Maryland* because the instructions "focused only on the

overall balancing question," and not on whether "the jury must determine the existence of each

individual mitigating factor unanimously."  *Id*. at 684.

     While the instructions and verdict forms in *Smith v. Spisak* are not identical to the ones in

Thompson's case, they do not differ in substance with respect to mitigating factors, and the high

court's reasoning therefore applies.  The only instruction in Thompson's case that required

unanimity was Instruction Number 6, stating, "The verdict of the Jury must be in writing, must

be unanimous and signed by one of you as Foreperson."  The Verdict Form did not make any

reference to the mitigating factors, and the jury was not instructed to make any findings as to

mitigating factors.  Nor were they instructed that the mitigating factors must be proven beyond a

reasonable doubt.  They were instructed to "consider" the mitigating facts and circumstances "as

you believe from the evidence to be true."  Trial Tr. at 1238.  The Verdict Form directed that the

jury make a finding only as to the verdict and, with respect to possible verdicts numbers three

and four imposing sentences for "confinement in the penitentiary for life without benefit of

probation or parole until he has served a minimum of twenty-five years of his sentence" and

death, respectively, the jury was required to write on the form the aggravating circumstances it found to be true beyond a reasonable doubt.

Therefore, similar to the instructions in *Smith v. Spisak*, "[n]either the instructions nor the forms said anything about how–or even whether–the jury should make individual determinations that each particular mitigating circumstance existed," *id.* at 684, as was the case in *Mills v. Maryland*. The instructions expressly required unanimity as to the verdict only. The instructions in Thompson's case are similar to *Smith v. Spisak* and other cases which have held that requiring unanimity as to the results of weighing aggravating factors against mitigating factors is different from requiring unanimity as to a finding of a mitigating factor to be proven. *See Coe v. Bell*, 161 F.3d 320, 338 (6th Cir. 1998) (finding that "requiring unanimity as to the *presence* of a mitigating factor" is a "far different matter" than requiring unanimity "as to the results of the *weighing*"). The instructions and verdict form here, read as a whole, did not meet, either through a direct statement or from what they implied, the standard as stated in *Mills v. Maryland*:

> a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance.

*Mills v. Maryland*, 486 U.S. at 384. The instructions regarding mitigating circumstances which instructed jurors to "consider" the mitigating facts and circumstances "as you believe from the evidence to be true," along with the absence of a finding of mitigating circumstances in the verdict form, suggest that each juror could individually consider the mitigators without having to unanimously agree.

53

Therefore, the Court concludes that the Kentucky Supreme Court's rejection of this claim was not "contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1); *accord Woodall v. Simpson*, No. 5:06CV-P216-R, 2009 U.S. Dist. LEXIS 14328, at *79-80 (W.D. Ky. Feb. 24, 2009) (this court's rejection of claim involving almost identical jury instructions), *aff'd*, 685 F.3d 574 (6th Cir. 2012).  Therefore, the Court denies habeas relief as to this claim of error.

However, given the slight distinction in the wording of the jury instructions from those in *Smith v. Spisak*, as well as statements from the dissent on this issue in *Kordenbrock v. Scroggy*, 919 F.2d 1091 (6th Cir. 1990), the Court believes that reasonable jurists could find the Court's analysis with respect to this claim to be debatable or wrong.  Accordingly, the Court will grant a certificate of appealability with respect to this claim.  *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473 (2000).

**F.      Claim Six – Flawed Proportionality Review**

Thompson next contends that the Kentucky Supreme Court's proportionality review process is unconstitutional.  He argues that the Kentucky Supreme Court only compared his sentence to other capital cases where the death penalty was imposed but should also have compared it to similar cases where the death penalty was not imposed.  He further complains that he did not receive access to the proportionality data compiled and relied on by the Kentucky Supreme Court.

Kentucky's proportionality statute provides that the Kentucky Supreme Court shall determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  Ky. Rev. Stat.

54

§ 532.075(3)(c).  To aid the court in its proportionality determination, Ky. Rev. Stat.

§ 532.075(6) requires the Chief Justice of the Kentucky Supreme Court to assign to an

administrative assistant who is an attorney the tasks of accumulating the records of all Kentucky

felony offenses in which the death penalty was imposed after January 1, 1970, providing the

court with summaries of those cases, and compiling any other data requested by the Chief Justice

for the purpose of determining the validity of the death sentence.

Comparative proportionality review, as opposed to inherent proportionality (which

measures the proportionality of a sentence to the severity of the crime), is performed on appeal

to ensure that a given death sentence is not disproportionate relative to other sentences imposed

for similar crimes.  As Thompson acknowledges, comparative proportionality review is not

required by the Constitution.  *Pulley v. Harris*, 465 U.S. 37, 43-44 (1984); *Bowling v. Parker*,

344 F.3d 487, 521 (6th Cir. 2003); *Cooey v. Coyle*, 289 F.3d 882, 928 (6th Cir. 2002); *see also*

*Coe v. Bell*, 161 F.3d at 352 (finding no Eighth Amendment right to proportionality review).

However, if a state adopts a scheme for such review, it must comport with due process.  *Bowling*

*v. Parker*, 344 F.3d at 521; *Greer v. Mitchell*, 264 F.3d at 691.  The state court's failure to

perform a statutory proportionality review is not reviewable in federal court as an issue of state

law.  *Pulley v. Harris*, 465 U.S. at 41; *Bowling v. Parker*, 344 F.3d at 521.  Instead, federal

habeas corpus review is limited to whether the state court engaged in proportionality review in

good faith.  *Walton v. Arizona*, 497 U.S. 639, 655-56 (1990), *overruled in part on other grounds*

*by Ring v. Arizona*, 536 U.S. 584 (2002).  Citing the lack of direction in the statute regarding

how the Kentucky Supreme Court is to conduct its proportionality review, the Sixth Circuit has

expressed grave doubts regarding whether the statute even creates a liberty interest giving rise to

55

a federal due process claim for alleged procedural lapses by the state supreme court in its review.

*Bowling v. Parker*, 344 F.3d at 521-22.

In *Bowling v. Parker*, 344 F.3d at 521-22, the Sixth Circuit considered and rejected the identical argument advanced here by Thompson:

> Bowling argues that the Kentucky Supreme Court only compared Bowling's sentence to other crimes where the death penalty was imposed, but should have compared Bowling's sentence to similar crimes where the death penalty was not imposed. There is no clear support in Kentucky law for the proposition that the Kentucky Supreme Court must also consider those additional cases. In fact, Bowling notes this, stating that "Kentucky has limited review to cases in which the death penalty was imposed." Appellant Br. at 121.
>
> Bowling's recognition that Kentucky law does not require consideration of those additional cases reveals that he is actually arguing that Kentucky has an ineffective framework for assessing proportionality rather than a claim that Kentucky misapplied its own framework. This forecloses Bowling's due-process argument, however, for there is no violation of due process as long as Kentucky follows its procedures. We note that we also have specifically rejected this type of challenge to Ohio's proportionality statutes.

*Id.* (citing *Buell v. Mitchell*, 274 F.3d 337, 368-69 (6th Cir. 2001)).

Thompson also complains about the Kentucky Supreme Court's refusal to share its underlying data. The Kentucky Supreme Court has held that a capital defendant does not have the right to the production of the court's proportionality research files for use in litigation. *Meece v. Commonwealth*, 348 S.W.3d at 728 (quoting *Hunt v. Commonwealth*, 304 S.W.3d 15, 52-53 (Ky. 2009)); *Ex parte Farley*, 570 S.W.2d 617 (Ky. 1978); *see also Skaggs v. Commonwealth*, 694 S.W.2d 672, 682 (Ky. 1985) (holding that the "public advocate is not entitled to data compiled for this Court pursuant to KRS § 532.075(6)(a), (b) and (c)"). In determining that Thompson's sentence was not excessive or disproportionate, the Kentucky Supreme Court "reviewed those cases since 1970 in which the death penalty was imposed for a

56

single murder and conclude[d] that the punishment herein is not excessive or disproportionate." *Thompson*, 147 S.W.3d at 55.  The Kentucky Supreme Court identified two cases in particular that it considered, *Johnson v. Commonwealth*, 103 S.W.3d 687 (Ky. 2003), and *Mills v. Commonwealth*, 996 S.W.2d 473 (Ky. 1999), both involving a single murder victim.  *Id.*  Many, if not all, of the cases reviewed by the Kentucky Supreme Court should be reported.  Thompson was free to examine the cases and make any arguments he deemed appropriate.  There is no constitutional requirement that a court must share its legal research with an appellant.

Thompson has failed to show that the Kentucky Supreme Court did not engage in proportionality review in good faith.  Accordingly, habeas relief on this claim of error is denied.

## G.    Claim Seven - Cumulative Effect

Finally, Thompson argues that the cumulative effect of these errors rendered his trial fundamentally unfair.  The Kentucky Supreme Court resolved this claim as follows:  "Appellant received a fundamentally fair penalty proceeding and there was insufficient harmless error to create a cumulative effect that would mandate reversal for a new trial."  *Thompson*, 147 S.W.3d at 55.

The Supreme Court has repeatedly stated that fundamentally unfair trials violate due process.  *See, e.g.*, *Riggins v. Nevada*, 504 U.S. 127 (1992).  However, "the law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue."  *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *see also Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) ("Post-AEDPA, [cumulative error] claim is not cognizable.") (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (discussing

cumulated evidentiary errors)).  Accordingly, the Court will also deny habeas relief as to this claim.

## VI.  CERTIFICATE OF APPEALABILITY

In the event that Thompson wishes to appeal any aspect of this Court's decision, he is required to obtain a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  A district court must issue or deny a COA and can do so even though the petitioner has yet to make a request for such a certificate.  *Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002) ("Whether the district court judge determines to issue a COA along with the denial of a writ of habeas corpus or upon the filing of a notice of appeal, the district judge is always required to comply with § 2253(c)(2)&(3) by 'indicat[ing] which specific issue or issues satisfy the denial of a constitutional right.' 28 U.S.C. § 2253(c)(2).").

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. at 483.  The Supreme Court has recognized that the current version of § 2253 codified the standard set forth in *Barefoot v. Estelle*, 463 U.S. 880, 894 (1983), and stated:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'" *Barefoot*, *supra*, at 893, and n. 4 . . . ("sum[ming] up" the "'substantial showing'" standard).

*Slack v. McDaniel*, 529 U.S. at 483-84.  The Supreme Court further noted that the standard used to govern the COA analysis depended upon whether the lower court dismissed the petition after a substantive review of the merits, or merely dismissed the petition on procedural grounds.  In

the case of the former, the Court held "the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.* at 484.  When a district court denies such a motion on procedural grounds without addressing the merits of the motion, a certificate of appealability should issue if the petitioner shows "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*  When a plain procedural bar is present and the district court is correct to invoke it to dispose of the matter, a reasonable jurist could not conclude either that the court erred in dismissing the petition or that the petitioner should be allowed to proceed further.  *Id.* at 484-85.  In such a case, no appeal is warranted.  *Id.* at 485.

This Court has reexamined the merits of the issues in light of *Slack*'s more "straightforward" analysis to determine whether reasonable jurists could find its analyses with respect to these grounds debatable or wrong.  With the exception of Thompson's claim number five that the jury instructions impermissibly implied that unanimity with respect to finding mitigating circumstances was required, it finds that none of the issues merits a COA.  The claims presented in the petition were clear-cut, easily addressed, and provided no bases for granting federal habeas relief.  The Court is persuaded that reasonable jurists would not debate the correctness of its assessment of these claims.  The basis of the Court's decision to grant a COA with respect to claim number five is explained in the body of this Opinion.

## VII.  CONCLUSION

For the foregoing reasons, the Court concludes that Thompson is not entitled to habeas relief.  The Court will enter a separate Order denying the petition and dismissing this action. The Court will also grant a COA as to claim number five and deny a COA as to all other claims by separate Order.

Date:

cc:      Counsel of record
4413.010